NOT DESIGNATED FOR PUBLICATION

No. 120,538

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BYRON ALEXANDER BROOKS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GUNNAR A. SUNDBY, judge. Opinion filed August 13, 2021. Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Joan Lowdon*, deputy county attorney, *Todd Thompson*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., ATCHESON, J., and BURGESS, S.J.

ATCHESON, J.: The tragic death of Byron Brooks' four-month-old son prompted a police investigation including a search of the apartment where they were staying. Officers found cocaine, a digital scale, and other paraphernalia in the residence. As a result, the State charged Brooks with various drug offenses. A jury sitting in Leavenworth County District Court found Brooks guilty of possession of cocaine with the intent to distribute within 1,000 feet of a school, possession of drug paraphernalia, and no drug tax stamps. We reverse the distribution conviction because the State failed to prove a school satisfying the statutory definition could be found within the required distance. And we

1

remand to the district court with directions to find Brooks guilty of the lesser included crime of possessing cocaine with the intent to distribute and resentence him accordingly. We otherwise affirm the convictions and sentences.

FACTUAL AND PROCEDURAL HISTORY

Brooks and his son were staying at an apartment Ciera Williams leased. She and Brooks were in an intimate relationship, although she was not the child's mother. Brooks apparently resided with Williams much, though not all, of the time. During the day on March 25, 2017, Williams laid the infant down in the bed where Brooks was sleeping. Brooks had taken Percocet, a prescription narcotic, and was stuporous. He apparently rolled over on the baby without awakening. Williams returned to the bedroom and realized the child was not breathing and in grave distress. Another adult at the apartment called 911.

First responders, including law enforcement officers, arrived promptly. Despite being transported to an area hospital, the infant had fatal injuries and was pronounced dead. The first responders had a difficult time awakening Brooks and learned from Williams he had taken the narcotic before going to bed. Given the circumstances, the law enforcement officers asked for permission to search the apartment. Both Williams and Brooks declined the request.

The officers quickly applied for and received a search warrant for the apartment from the district court. The search warrant identified the crime being investigated as aggravated child endangerment, a violation of K.S.A. 2016 Supp. 21-5601, and the items to be seized as: "Clothing. Bedding. [B]odily fluid such as blood or saliva. Scheduled narcotics, prescribed or illicit."

2

Armed with the warrant, the officers searched the apartment. In the bedroom, they found a Crown Royal bag on the floor underneath some blankets. The bag contained a prescription pill container labeled for Brooks, $125 in cash, a cigarette lighter, a straw, and a digital scale. Both the straw and the scale had white powdery residue on them. In the pill bottle, the officers found two plastic sandwich bags; one held about 21 grams of cocaine, and the other held about 30 grams of cocaine. In a purse in the bedroom closet, the officers found another pill container with Brooks' name that had a plastic bag with just under 5 grams of cocaine in it. Under the sink in a bathroom, the offices discovered a credit card in Williams' name, a plate, and a straw—all of which appeared to have drug residue on them. The officers could find no drug tax stamps. See K.S.A. 79-5201 et seq. (requiring purchase of tax stamps for various illegal drugs including cocaine and criminalizing the failure to obtain tax stamps). The cocaine and those items formed the basis of the criminal charges filed against Brooks in this case.

In the bedroom, the officers found identification belonging to Brooks and mail sent to him at another address. Clothing and other personal items belonging to Williams or Brooks were in various places in the apartment. They also found a purse in the bedroom that contained marijuana and identification belonging to Williams.

Jurors heard the case over two days in mid-February 2018. As we indicated, the jury convicted Brooks of possessing cocaine with the intent to distribute within 1,000 feet of a school, a severity level 2 drug felony; possession of drug paraphernalia for the digital scale, a severity level 5 drug felony; and no tax stamps, a severity level 10 nonperson felony under K.S.A. 79-5208. The jury found Brooks not guilty of one count of misdemeanor possession of drug paraphernalia based on the plate, straw, and credit card. The district court later ordered Brooks to serve 117 months in prison on the cocaine possession conviction, reflecting a mitigated guidelines sentence, imposed concurrent sentences on the other convictions, and placed him on postrelease supervision for 36 months. Brooks has appealed.

Brooks has raised an array of issues on appeal. We take up the points serially, adding facts as necessary for each.

*Denial of Motion to Suppress Evidence*

Brooks has appealed the district court's denial of his pretrial motion to suppress the evidence the law enforcement officers found in the apartment—specifically the cocaine and the drug paraphernalia. He contends the application and the search warrant failed to establish probable cause that a crime had been committed and the warrant failed to describe the items to be seized with sufficient particularity. According to Brooks, the search, therefore, violated his rights protected in the Fourth Amendment to the United States Constitution and the evidence seized should not have been used against him under the exclusionary rule. See *United States v. Leon*, 468 U.S. 897, 908-09, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) ("The Court has, to be sure, not seriously questioned, 'in the absence of a more efficacious sanction, the continued application of the [exclusionary] rule to suppress evidence from the [prosecution's] case where a Fourth Amendment violation has been substantial and deliberate.'"); *State v. Ellis*, 311 Kan. 925, 933-34, 469 P.3d 65 (2020) (discussing exclusionary rule and exceptions to its application).

At the suppression hearing, the district court reviewed the application and the warrant but received no other evidence. The prosecutor and Brooks' lawyer argued their respective legal positions on the constitutional sufficiency of the search. In reviewing a district court's decision to sign a search warrant, we—like the district court hearing the motion to suppress—ask whether the information properly submitted in support of the warrant established a "substantial basis" for its issuance. The standard is purposefully deferential to the district court's decision to approve the warrant, thereby encouraging law

enforcement officers to seek search warrants in the first place. See *State v. Mullen*, 304 Kan. 347, 353, 371 P.3d 905 (2016).

To obtain a search warrant, government agents must present a judge with an affidavit or other sworn statements demonstrating probable cause that a crime has occurred and that specifically described evidence related to the crime may be found in a particular place. See *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) (probable cause contraband or evidence of crime in particular place); *Zurcher v. Stanford Daily*, 436 U.S. 547, 554, 98 S. Ct. 1970, 56 L. Ed. 2d 525 (1978) (probable cause crime occurred); *State v. Hicks*, 282 Kan. 599, 605-08, 147 P.3d 1076 (2006) (both). Probable cause is a somewhat elastic measure of proof requiring sufficient evidence to cause a person of reasonable prudence to believe a stated proposition to be stronger than a suspicion but not so strong that it must be more probably true than not true. See *Texas v. Brown*, 460 U.S. 730, 742, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983); *State v. Beltran*, 48 Kan. 857, 864-65, 300 P.3d 92 (2013). The search warrant, in turn, must describe with particularity the place to be searched and the items that may be seized from that place. *Groh v. Ramirez*, 540 U.S. 551, 557-58, 124 S. Ct. 1284, 157 L. Ed. 1068 (2004); *State v. Kleypas*, 305 Kan. 224, 246, 382 P.3d 373 (2016).

Here, law enforcement officers applied for and received the search warrant the same day Brooks' son died and sought to investigate that death as possible aggravated endangerment of a child. We presume the principal suspect was Williams, since she apparently told officers that she was aware Brooks had taken a powerful prescription narcotic before going to sleep and, nonetheless, placed the infant in the same bed with him. The affidavit submitted as part of the warrant request outlines those circumstances, although it implies Williams knew Brooks had taken Percocet. As defined in K.S.A. 2020 Supp. 21-5601(b)(1), aggravated engagement of a child includes recklessly placing a minor child "in a situation in which the child's life, body or health is endangered." Recklessness is a statutorily defined mental state evincing "conscious[ ] disregard[ ] [of]

5

a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2020 Supp. 21-5202(j).

Probable cause to show a crime has been committed does not require evidence touching on every element of the offense. *Hicks*, 282 Kan. at 605. The circumstances briefly described in the affidavit showed Williams placed the infant in a foreseeably precarious position that could and ultimately did endanger his life. The affidavit, therefore, established probable cause to believe the crime of aggravated reckless endangerment occurred. To be sure, Williams would have had fair defenses in such a prosecution. And we infer from the record in this case that no one was charged in the baby's death. But that does not undermine the legal sufficiency of the search warrant. Nor does it matter that the warrant identified a crime other than the ones Brooks eventually faced or that Brooks was not necessarily a suspect in the identified crime. See *Zurcher*, 436 U.S. at 559-60 (Fourth Amendment permits search warrant for premises even though no one with possessory interest in property is suspected of criminal wrongdoing). We, therefore, reject Brooks' argument the warrant and the resulting search were constitutionally improper because the supporting affidavit failed to establish probable cause for the search.

Brooks challenges the search warrant on the grounds it describes the items to be seized with insufficient particularity. Among the principal evils the Fourth Amendment sought to eradicate were general warrants giving government officials—in colonial American, agents of the King—largely unconstrained authority to search high and low and to seize property as they wished. See *Payton v. New York*, 445 U.S. 573, 583-85 & n.21, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *Stanford v. Texas*, 379 U.S. 476, 482, 85 S. Ct. 506, 13 L. Ed. 2d 431 (1965). The Fourth Amendment itself explicitly requires search warrants to "particularly describ[e] the . . . things to be seized." U.S. Const. amend. 4.

6

Brooks contends the search warrant's identification of each of the items to be seized is too general. He, likewise, says they lack a sufficient connection—a "nexus" in legal parlance—to the alleged crime. *State v. Powell*, 299 Kan. 690, 696, 325 P.3d 1162 (2014). We assume without deciding that Brooks might have a point with respect to the objects described in the warrant as clothing, bedding, and bodily fluids. Those are rather broad categories, and the relevance of those things to the crime of aggravated reckless endangerment doesn't seem self-evident. The affidavit does not explain how they might be relevant.

But a search warrant with some imprecise or overbroad descriptions of items to be seize isn't necessarily constitutionally insufficient as to other precisely defined categories. See *United States v. Coleman*, 909 F.3d 925, 931 (8th Cir. 2018); *United States v. Galpin*, 720 F.3d 426, 448-49 (2d Cir. 2013); *Cassady v. Goering*, 567 F.3d 628, 637-38 (10th Cir. 2009); *United States v. Sells*, 463 F.3d 1148, 1154-55 (10th Cir. 2006). State and federal courts have consistently recognized a severability doctrine that would enforce constitutionally sufficient categories in a warrant and effectively excise those that are not, although they do not necessarily agree on how to apply such a rule. See 2 LaFave, Search & Seizure § 4.6(f) (6th ed. 2020) (pronouncing severance doctrine "sound" because Fourth Amendment "objectives of deterrence and integrity may be served . . . by limiting suppression to the fruits of the warrant's unconstitutional component" and collecting cases). We have found no controlling Kansas appellate authority considering this sort of severability rule, and the parties have cited none.

Some courts simply excise the categories of items considered to be too generally described, thereby suppressing any evidence seized through them, and then enforce the remainder of the search warrant. See, e.g., *Coleman*, 909 F.3d at 931. Other courts take a more holistic approach to consider whether the offending general categories infect otherwise particularized descriptors or so dominate the character of the warrant as to

render the document constitutionally deficient in its entirety. If not, the offending general categories will be severed, and the remainder of the warrant enforced. See, e.g., *Sells*, 463 F.3d at 551. Under either approach, the exclusion of any seized evidence would be subject to the good-faith exception to the exclusionary rule if the government agents conducting the search reasonably relied on the district court's decision to authorize the warrant. See *United States v. Castro*, 881 F.3d 961, 966 (6th Cir. 2018) (recognizing good-faith exception may allow prosecutors to use evidence obtained under impermissibly general categories of search warrant); see also *Leon*, 468 U.S. at 913 (Court holds that evidence typically should not be suppressed if the law enforcement officers rely in good faith on signed search warrant); *Ellis*, 311 Kan. at 934-35 (noting good-faith exception).

Here, we find the severability doctrine should be applied in some fashion to a search warrant's descriptions of the things to be seized. We need not decide the full contours of that application. Even if the more nuanced (and rigorous) analysis outlined in *Sells* reflects the better constitutional approach, Brooks' challenge fails. So we do not reach the good-faith exception to the exclusionary rule, since we find law enforcement officers properly seized the drug evidence under the warrant.

The item to be seized—"scheduled narcotics, prescribed or illicit"—is specific rather than general. It identifies a narrow range of drugs that may be considered pain killers or depressants rather than any kind of pharmaceutical. And the category is plainly distinct from the other types of evidence to be seized listed in the warrant that may have been too broadly described. Narcotics also had a readily apparent connection to the crime law enforcement officers were investigating. Brooks apparently had taken some sort of narcotic based on what was immediately reported to the first responders and the difficulty they had in awaking him. Although the first responders were told Brooks had taken Percocet, the warrant was properly drawn for narcotics. The report of the exact drug may have been mistaken or Brooks might have taken other narcotics in addition to the

8

Percocet. The presence of similar drugs in the apartment would have had some bearing on the recklessness of Williams' decision to place the infant in bed with Brooks, who had taken some drug or drugs significantly dulling his perceptions. Cocaine is statutorily classified as a schedule II narcotic and, therefore, falls within the particular category described in the search warrant. See K.S.A. 65-4107(b)(5).

In executing the search warrant, the law enforcement officers were entitled to look anywhere in the apartment narcotic drugs might be found. See *State v. Schoonover*, 281 Kan. 453, 518, 133 P.3d 48 (2006); see also *United States v. Gamble*, 388 F.3d 74, 76-77 (2d Cir. 2004) ("The officers in this case had a Fourth Amendment justification for searching the contents of Gamble's drawer because they had a warrant authorizing them to search for and seize cocaine and drug paraphernalia—items that could plausibly be found in a dresser drawer."). Brooks does not argue the officers did otherwise. If government agents find obvious contraband while conducting a constitutionally proper search, they may seize the contraband even though it does not come within the items identified in the warrant. See *Horton v. California*, 496 U.S. 128, 141-42, 110 S. Ct. 1301, 110 L. Ed. 2d 112 (1990); *Russell v. Harms*, 397 F.3d 458, 465 (7th Cir. 2005); *United States v. Tucker*, 305 F.3d 1193, 1202-03 (10th Cir. 2002). The officers properly looked in the Crown Royal bag for narcotics and in doing so found not only the cocaine but the digital scale and additional things that under the circumstances were fairly considered drug paraphernalia. The same was true for the other items the officers confiscated as paraphernalia from elsewhere in the apartment.

The district court correctly denied Brooks' motion to suppress the cocaine and things seized as drug paraphernalia. They were properly admitted as evidence against Brooks during the trial.

*Evidence of Intent to Distribute within 1,000 Feet of School*

Brooks contends the State presented insufficient evidence to establish that he possessed cocaine with the intent to distribute within 1,000 feet of a school. Brooks specifically challenges the State's proof that there was a school near enough to the apartment he shared with Williams.

Under K.S.A. 2020 Supp. 21-5705(d)(5), if the State proves a defendant illegally possesses a regulated drug with the intent to distribute the drug within 1,000 feet of "school property," the severity level of the crime is elevated one level, substantially increasing the presumptive punishment under the sentencing guidelines. Because proximity to a school operates as a sentencing enhancement, the State must prove that fact to the jury beyond a reasonable doubt. See *State v. Witten*, 45 Kan. App. 2d 544, 549-51, 251 P.3d 54 (2011). For Brooks, the added element converted the crime of possession with intent to distribute to a severity level 2 drug offense and, given his criminal history, increased the presumptive punishment from a range of 65 to 72 months to a range of 117 to 130 months. For purposes of drug crimes, "school property" is defined as "property upon which is located a structure used by a unified school district or an accredited nonpublic school for student instruction or attendance or extracurricular activities of pupils enrolled in kindergarten or any of the grades one through 12." K.S.A. 2020 Supp. 21-5701(r).

In assessing a defendant's challenge to the sufficiency of the evidence, we construe the evidence in a light most favorable to the party prevailing in the district court, here the State, and in support of the jury's verdict. An appellate court will neither reweigh the evidence generally nor make credibility determinations specifically. *State v. Jenkins*, 308 Kan. 545, Syl. ¶ 1, 422 P.3d 72 (2018); *State v. Butler*, 307 Kan. 831, 844-45, 416 P.3d 116 (2018); *State v. Pham*, 281 Kan. 1227, 1252, 136 P.3d 919 (2006). The issue for review is whether rational jurors could have found the defendant guilty beyond a

reasonable doubt. *Butler*, 307 Kan. at 844-45; *State v. McBroom*, 299 Kan. 731, 754, 325 P.3d 1174 (2014).

Here, the State called Detective Tesh St. John, an officer with the Leavenworth Police Department who was at the apartment in March 2017 during the search, as a witness at trial. He testified that the apartment was less than 1,000 feet from Lawson Elementary School and that children attended classes there. Brooks did not actively dispute that testimony. The State also called Detective Heather Vogel, another officer with the Leavenworth Police Department. Vogel testified she had been assigned to Unified School District No. 453 between 2014 and December 2016 as a school resource officer before being promoted to detective. The prosecutor asked Vogel, "Are you familiar with Lawson Elementary?" Vogel responded, "Yes." She was then asked, "[I]n March 2017[,] was it a fully functioning school?" She answered, "It was." The prosecutor inquired whether children attended the school daily and received an affirmative response from Vogel. Brooks' lawyer did not cross-examine Vogel. So Vogel never testified she worked at Lawson Elementary School or that the school was part of the U.S.D. No. 453 system. The State offered no other evidence on the point.

The brief testimony from Det. St. John and Det. Vogel, though uncontested, failed to establish a sufficient basis for reasonable jurors to conclude Lawson Elementary School was operated by a unified school district or an accredited private school. Somebody apparently held classes for children there. But the evidence showed no more, and any conclusion beyond that would have been insufficiently grounded speculation rather than reasoned inference. See *State v. Baumgarner*, 59 Kan. App. 2d 330, 340, 481 P.3d 170 (criminal conviction cannot rest on "unsupported speculation or conjecture"), *rev. denied* 313 Kan. ___ (April 23, 2021).

Our determination parallels *Witten* and more particularly *State v. Star*, 27 Kan. App. 2d 930, 936, 10 P.3d 37 (2000). In *Star*, this court reversed the defendant's

11

conviction under the predecessor to K.S.A. 2020 Supp. 21-5705, holding the State failed to present evidence that an elementary school was used by a school district or an accredited private school. The evidence showed only that the defendant sold cocaine in a park within 1,000 feet of a building known as Hickok School without identifying who used the premises or for what purposes. The court rejected the State's argument the jurors, who all resided in the county, could rely on their "common sense" and "their background of experience" to infer the building was used as a school by the local unified school district. 27 Kan. App. 2d at 934. The court held that permitting the jurors to do so would entail impermissible speculation resting on their personal factual observations made outside the judicial process rather than on the evidence presented at trial. 27 Kan. App. 2d at 935-36. The *Witten* decision is of a kind with *Star*. In *Whitten*, the State presented testimony from a detective that Unified School District No. 382 used a building known as Liberty Middle School. But no one testified the building was used to educate students, as required by the governing definition of "school property." Relying on *Star*, the *Whitten* court held the State failed to present sufficient evidence that a sale of illegal drugs had taken place within 1,000 feet of a school. 45 Kan. App. 2d at 551-52.

Superficially, this may seem to be what the appellate courts often characterize as "a close question," meaning a good argument could be made for the opposite result. But the first impression would be mistaken, as they often are. The State's evidence fell well short of showing the specific nature of the entity using the elementary school, contrary to the statutory requirements for a conviction. Had the prosecutor more carefully assessed what had to be proved, the State presumably could have presented persuasive evidence, perhaps through more tightly framed questions to Vogel or by calling a school administrator as a witness. But the apparent ease in proving the essential fact doesn't somehow bolster the otherwise inadequate evidence presented at trial.

Our ruling leaves intact the jury's findings that Brooks possessed cocaine with an intent to distribute—a lesser included crime. The appropriately tailored remedy requires

12

that we reverse the conviction based on the proximity of the apartment to the purported school property and remand to the district court with directions to find Brooks guilty of possession of cocaine with an intent to distribute consistent with the remaining elements of the crime of conviction and to sentence him accordingly. *State v. Wilt*, 273 Kan. 273, 277-78, 44 P.3d 300 (2002); *Witten*, 45 Kan. App. 2d at 551-52.

*State's Exercise of Peremptory Challenge to Prospective Juror*

During jury selection, the State used one of its peremptory challenges to remove an African-American woman from the pool of prospective jurors. Brooks' lawyer disputed the juror strike under *Batson v. Kentucky*, 476 U.S. 79, 88-89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The district court denied the request, and Brooks asks us to review the ruling.

In *Batson* and a series of later decisions, the Court recognized twin equal protection considerations supporting a prohibition on the State's use of racially based peremptory challenges or juror strikes. First, defendants are denied the right to equal protection if the State seeks to try them before juries "from which members of [their] race have been purposefully excluded." 476 U.S. at 85. Just as important, however, citizens called for jury duty have a constitutional right to serve if they are otherwise qualified. The State violates that right when a prosecutor eliminates them during the jury selection process because of their race. 476 U.S. at 87. Exclusion of citizens from jury service based on race reflects "a primary example of the evil the Fourteenth Amendment was designed to cure." 476 U.S. at 85; see *Miller-El v. Dretke*, 545 U.S. 231, 237-38, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (noting the dual equal protection violations attendant to the State's race-based removal of potential jurors during the selection process). The Kansas Supreme Court has, of course, recognized and enforced those constitutional rights. See *State v. Gonzalez*, 311 Kan. 281, 302-03, 460 P.3d 348 (2020).

13

Here, Brooks' lawyer specifically invoked *Batson* in disputing the prosecutor's decision to excuse the African-American woman. Under *Batson*, the question then becomes whether the prosecutor acted with purposeful racial discrimination or animus in removing the potential juror. The analytical framework for answering that question draws on a three-step model developed in employment discrimination cases to probe an employer's intent in hiring, firing, promoting, or otherwise making workplace decisions. *Johnson v. California*, 545 U.S. 162, 170-71 & n.7, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005). The method looks at circumstantial evidence of intent, since persons discriminating based on race seldom announce their true purpose.

The first step requires the party asserting the *Batson* violation, here Brooks, to offer prima facie evidence of discriminatory intent. The burden is not an onerous one. The district court seemed to presume Brooks made a prima facie showing, and we do likewise. Although the record is less than clear, the female juror apparently was the only African-American on the prospective panel. See *State v. Hood*, 242 Kan. 115, 120, 744 P.2d 816 (1987) (recognizing prima facie *Batson* showing if State peremptorily strikes the only African-American among the prospective jurors); contra *Crittenden v. Ayers*, 624 F.3d 923, 955-56 (9th Cir. 2010) (government's peremptory strike of only African-American "relevant consideration" under *Batson* but alone fails to establish prima facie discrimination); cf. *United States v. McMath*, 559 F.3d 657, 664 (7th Cir. 2009) (government's presentation of race-neutral reason for juror strikes without objection to prima facie showing of discrimination renders later objection on that basis moot); *United States v. Roebke*, 333 F.3d 911, 913 (8th Cir. 2003) (same).

The second step requires the responding party, here the State, to present a race-neutral reason for the peremptory challenge. *Miller-El*, 545 U.S. at 239; *Johnson*, 545 U.S. at 168, 170; *State v. McCullough*, 293 Kan. 970, 992, 270 P.3d 1142 (2012). The burden on the State is not stringent. *Purkett v. Elem*, 514 U.S. 765, 767-68, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) ("The second step of this process does not demand an

explanation that is persuasive, or even plausible."). Here, the prosecutor stated that during voir dire, the prospective juror "indicated a natural distrust [of] law enforcement officers," although she said she "'would try'" to assess their testimony in the same way as other witnesses. The transcript of jury selection confirms the prosecutor's summary of the exchange with the woman. The district court correctly found the stated reason for the peremptory strike of the prospective juror to be race neutral. Although not specifically mentioned by the prosecutor, the same prospective juror said she knew a crime victim who law enforcement officer had recently treated unfairly.

The judicial inquiry is then supposed to move to the third and final step of the *Batson* framework allowing the party asserting the violation to point to anything else in the record suggesting the prosecutor's stated reason to be a pretext or coverup for purposeful racial discrimination. *Miller-El*, 545 U.S. at 251-52; *Purkett*, 514 U.S. at 768; *McCullough*, 293 Kan. at 993-94. Here, however, the district court denied Brooks' *Batson* claim upon the prosecutor's enunciation of the stated reason for the peremptory challenge. But Brooks' lawyer did not object or otherwise attempt to offer an argument on or cite evidence of pretext.

On appeal, Brooks shifts the legal basis for his argument from the Equal Protection Clause of the Fourteenth Amendment to § 1 of the Kansas Constitution Bill of Rights and suggests a more rigorous test should govern the assessment of racial discrimination. We question whether Brooks can so dramatically shift the constitutional foundation for his attack on the State's use of peremptory strikes. The argument he now presents differs substantially from the enunciated *Batson* claim he posed to the district court.

In comparable circumstances, another panel of this court recently considered an argument on juror strikes under § 1 for the first time on appeal. *State v. Reed*, No. 120,613, 2021 WL 1228097, at *5 (Kan. App. 2021) (unpublished opinion), *petition for*

15

*rev. filed* May 3, 2021. We do likewise and find the reasoning of *Reed* on this issue persuasive. So we, too, assume without deciding that Brooks' argument under the Kansas Constitution is properly before us, even though that ground was not identified in the district court and is not inherent in a *Batson* objection based on federal law. Our analysis borrows extensively, often verbatim, from *Reed* without further attribution. 2021 WL 1228097, at *5-8. [1]

[1]Judge Atcheson authored the unpublished opinion in *Reed*.

The language of § 1 of the Kansas Constitution Bill of Rights accords "[a]ll men . . . equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness" and, thereby, seems to constitutionalize a narrow set of rights so fundamental they otherwise transcend forms of government. The framers of the Kansas Constitution adapted the section from a passage in the Declaration of Independence in which Thomas Jefferson set down his version of Lockean natural rights. By 1859, when that portion of the Kansas Constitution was written, inalienable rights had become a rallying cry for abolitionists and the newly formed Republican Party in opposing the spread of slavery. And the framers of the Kansas Constitution debated § 1 in that context. Brooks, therefore, suggests § 1 affords him a more robust right than the Court recognized in *Batson* under the Fourteenth Amendment. See *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, Syl. ¶ 6, 440 P.3d 461 (2019).

Brooks also suggests § 1 includes something comparable to the Equal Protection Clause of the Fourteenth Amendment. Without elaborate explanation, the Kansas Supreme Court has regularly described § 1 and § 2 of the Kansas Constitution Bill of Rights in tandem as providing protections like the Equal Protection and Due Process Clauses of the Fourteenth Amendment. See *State v. Limon*, 280 Kan. 275, 283, 122 P.3d 22 (2005); *Henry v. Bauder*, 213 Kan. 751, 752-53, 518 P.2d 362 (1974). For purposes of deciding this appeal, we assume the premise of Brooks' construction of § 1 as including

16

an equal protection right in addition to the explicitly identified inalienable natural rights. The distinct equal protection right Brooks imputes to § 1 would, then, be legally comparable to the Equal Protection Clause of Fourteenth Amendment. The Kansas Supreme Court has consistently recognized that state constitutional rights with counterparts in the federal Constitution should be construed to be equivalent. See *State v. Zwickl*, 306 Kan. 286, 291, 393 P.3d 621 (2017) (prohibition on unreasonable government searches and seizures); *Limon*, 280 Kan. at 283-84 (equal protection rights); see also *Alpha Medical Clinic v. Anderson*, 280 Kan. 903, 920, 128 P.3d 364 (2006) (Kansas Constitution typically construed "to echo" comparable provisions of United States Constitution). So federal precedent offers highly persuasive guidance in their construction and application.

We are not disposed to see in § 1 an extensive buffet of inalienable rights extended to criminal defendants of such particularity and specificity that some of them regulate details of how jury trials should be conducted, including the manner of selecting the jurors, receiving evidence, and even rendering judgments. Regulation of governmental mechanisms, such as the judicial process, is undeniably important and necessarily implicates certain constitutional rights. But those mechanisms do not exist inherently outside of or beyond the institutions of governance and, therefore, presumably neither create nor command natural or inalienable rights. By the same token, however, governmental institutions cannot diminish those inalienable rights, except in especially compelling circumstances. See *Hodes & Nauser*, 309 Kan. at 669.

Given the time and place § 1 was written and adopted, we are far more inclined to say those inalienable rights do permit African-Americans to serve on juries free of race-based discrimination that would exclude them from that service. Section 1 was aimed at ending slavery and government endorsement of involuntary servitude impressed upon a class of people and their descendants defined essentially by race. There would seem to be no gross distortion of § 1 in holding government sanctioned exclusion of African-

17

Americans from jury service represents a denial of self-determination, as a component of the inalienable right of liberty, and effects a continuing badge of slavery. As the *Batson* Court recognized, individuals excluded from jury service because of race have no practical way to vindicate their own right to be free of such discrimination, so criminal defendants may, by proxy, lodge objections on their behalf. Without much trepidation, we suppose that to be sensible under § 1, as well. Brooks, therefore, could make an objection on behalf of the African-American woman the prosecutor peremptorily dismissed from the jury pool.

What remains is how to assess a putative violation of the § 1 inalienable right of a prospective juror to serve and the separate § 1 equal protection rights of both prospective jurors and criminal defendants to a jury selection process free of racial discrimination. The Kansas Supreme Court has repeatedly embraced the three-step method of proof first outlined in *Batson*. *Gonzalez*, 311 Kan. at 302-03; *State v. Williams*, 308 Kan. 1320, 1328, 429 P.3d 201 (2018). We have no reason to believe the court would stake out a different approach under § 1.

As we have indicated, the district court applied an abridged version of the three-stage *Batson* test, dispensing with an assessment of Brooks' prima facie evidence and jumping immediately to the second stage. The prosecutor provided a race-neutral reason for the peremptory strike supported in the record. The district court, however, did not allow Brooks to respond before denying the *Batson* objection, effectively eliminating the third and most critical step. But Brooks did not then object to how the district court handled the *Batson* challenge. Based on the trial record and the governing legal principles, we find no reversible error.

On appeal Brooks tries to avert that result with two arguments—one reexamining the trial record and the other proposing a new legal standard for assessing the exclusion of potential jurors. We find neither persuasive.

18

First, Brooks contends the prosecutor declined to strike a white woman from the jury panel who was otherwise comparable to the African-American woman the prosecutor did remove. Defendants can advance *Batson* challenges by showing that prosecutors have struck African-Americans as potential jurors while retaining otherwise comparable Caucasians. See *Snyder v. Louisiana*, 552 U.S. 472, 483-84, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008); *Miller-El*, 545 U.S. at 241, 244-48; *McCullough*, 293 Kan. at 995. Here, the timing is a problem because Brooks never presented the comparator argument for the district court's consideration. Nevertheless, we examine the contention.

During voir dire, the prosecutor posed an abstract question to the prospective jurors about "deferring to" a conclusion offered by a person "who may have training and experience you don't have." The record does not indicate whether the white prospective juror raised her hand in response or was randomly called upon by the prosecutor. In any event, the woman essentially said she would want to know "how experienced" the hypothetical experts might be and what sort of "credentials" they had before deciding what weight to give their opinions.

We cannot say the two potential jurors expressed even roughly similar views or concerns. The African-American woman candidly said she didn't particularly trust law enforcement officers and knew someone who recently had a negative encounter with the police. Those are the sort of blanket sentiments voir dire aims to reach, so the parties can make reasoned choices about who they would prefer on the jury. A prosecutor understandably might want jurors without such sweepingly negative views, especially when the State's principal witnesses would be law enforcement officers. The white juror declined to say categorically she would accept the opinions of persons represented to be experts without knowing something about the basis for their expertise. Jurors are expected to exercise that kind of discernment in considering the testimony of witness, including those offered as experts. See *Tonn Family Limited Agricultural Partnership v.*

19

*Western Agricultural Insurance Co.*, No. 120,933, 2021 WL 1045206, at *11 (Kan. App. 2d 2021) (unpublished opinion) ("[I]t was ultimately the jury's decision to determine which expert witness and opinions it should give more weight to based on the evidence admitted at trial."); PIK Crim. 4th 51.060 (2020 Supp.) (jurors to determine weight and credit to be given witnesses); PIK Crim. 4th 51.170 (2020 Supp.) (jurors to give expert testimony "weight and credit" they determine "appropriate" as they would "any other testimony"). Brooks' suggestion the two potential jurors were comparable apart from their race fails. One juror acknowledged a preconception that might interfere with her ability to objectively assess the evidence; the other outlined an approach to considering expert testimony that essentially captured what jurors are supposed to do.

Second, Brooks contends the Kansas appellate courts should adopt a new evidentiary method for evaluating the use of peremptory jury strikes as a violation of § 1 of the Kansas Constitution Bill of Rights. As we have indicated, we do not believe we have the liberty to take that step, given the Kansas Supreme Court's recent and essentially unequivocal adherence to the *Batson* framework, albeit in furtherance of equal protection rights under the Fourteenth Amendment.

The *Batson* approach has drawn criticism as a tool that is far too often ineffective in identifying the racially motivated use of peremptory juror strikes. See, e.g., *Miller-El*, 545 U.S. at 266-69 (Breyer, J., concurring); *State v. Saintcalle*, 178 Wash. 2d 34, 43-46, 309 P.3d 326 (2013); Frampton, *For Cause:  Rethinking Racial Exclusion and the American Jury*, 118 Mich. L. Rev. 785, 786-88 (2020). Brooks submits we should adopt an analytical test the Washington Supreme Court fashioned in *State v. Jefferson*, 192 Wash. 2d 225, 229-30, 429 P.3d 467 (2018), to replace the *Batson* model. The *Jefferson* test shifts the ultimate issue from whether the party removing the potential juror was motivated by racial animus or discriminatory intent to whether an objective observer would conclude race "was a factor" in the decision. 192 Wash. 2d at 229-30. The standard is considerably less demanding.

We would not necessarily be disposed to turn to *Jefferson* to replace the final step of the three-part *Batson* model even if we were free to do so. The *Jefferson* court was divided and issued three opinions addressing the point. And the Washington Supreme Court has since superseded *Jefferson* with a court rule governing the use of and challenges to peremptory jury strikes that has a comparable purpose but operates somewhat differently by describing the characteristics of the hypothesized "objective observer," identifying a nonexclusive list of factors a district court should consider in ruling on an objection to a peremptory strike, and recognizing "presumptively invalid" reasons for exercising peremptory strikes. Wash. R. Gen. Application 37 (2018). Moreover, we would be disinclined to apply the *Jefferson* evidentiary standard to the record here as an abstract appellate exercise. The record, however, does not necessarily cultivate a picture of race as a motivating factor in the prosecutor's decision to excuse the potential juror.

*Jury Instruction on Nonexclusive Possession of Drugs*

During the trial, the jurors heard evidence Williams leased the apartment and lived there and Brooks was a regular occupant of the dwelling for extended periods. Some of the cocaine and paraphernalia were found in places that were readily accessible to both Williams and Brooks—most notably, perhaps, the Crown Royal bag found on the bedroom floor. To prove criminal possession, the State had to do more than establish the contraband and Brooks were in the apartment at the same time. The evidence had to show Brooks exercised exclusive control over the drugs and paraphernalia or shared control of them with Williams. When two or more persons exercise dominion over illegal drugs or other contraband, Kansas law refers to that as "joint control" or "nonexclusive possession." And that sort of shared dominion is sufficient to support a conviction for unlawful possession. Conversely, if the jurors entertained a reasonable belief that

21

Williams had exclusive control of the drugs and paraphernalia, they should have found Brooks not guilty. See *State v. Keel*, 302 Kan. 560, Syl. ¶ 1, 357 P.3d 251 (2015).

Brooks requested a jury instruction incorporating factors the Kansas Supreme Court has regularly recognized as bearing on joint control or nonexclusive possession. See *Keel*, 302 Kan. 560, Syl. ¶ 1; *State v. Abbott*, 277 Kan. 161, 168, 83 P.3d 794 (2004). The district court declined to give the instruction because the approved pattern instructions included nothing like it. The district court instructed the jurors using the statutory definition of possession in K.S.A. 2020 Supp. 21-5701(q) that had been incorporated into various pattern instructions on possession of illegal drugs or paraphernalia. See PIK Crim. 4th 57.040.

Brooks has appealed the district court's refusal to instruct the jury as he requested. We engage a sequential inquiry to assess a claimed instructional error and consider: (1) reviewability entailing preservation of the issue at trial and jurisdiction; (2) the legal appropriateness of the instruction; (3) the factual support in the evidence for the instruction; and (4) the harmlessness of any actual error. *State v. Craig*, 311 Kan. 456, 464, 462 P.3d 173 (2020); *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012). Brooks has preserved this issue, and we have jurisdiction to consider it.

The legal appropriateness of Brooks' instruction or something akin to it requires a bit of historical background on joint control and nonexclusive possession. The Kansas Supreme Court fashioned a common-law definition of possession for drug cases. See *Keel*, 302 Kan. at 567; *State v. Washington*, 244 Kan. 652, 654, 772 P.2d 768 (1989); *State v. Flinchpaugh*, 232 Kan. 831, 833-34, 659 P.2d 208 (1983). The Kansas Legislature essentially codified the definition in 2009, and "possession" is now defined in K.S.A. 2020 Supp. 21-5701(q) to mean "having joint or exclusive control over an item with knowledge of and intent to have such control or knowingly keeping some item in a place where the person has some measure of access and right of control."

22

Before codification, the appellate courts recognized particular factors bearing on possession of contraband discovered in areas subject to control by more than one person. See *Keel*, 302 Kan. at 566-68 (factors applied to residence); *Abbott*, 277 Kan. at 168 (factors applied to motor vehicle); *State v. Faulkner*, 220 Kan. 153, 160, 551 P.2d 1247 (1976) (noting factors). In *Keel*, the court outlined factors indicative of possession of drugs or paraphernalia this way: "(1) the defendant's previous sale or use of narcotics; (2) the defendant's proximity to the area in which the drugs were found; (3) the fact that the drugs were found in plain view; and (4) the defendant's incriminating statements or suspicious behavior." 302 Kan. 560, Syl. ¶ 2. Other circumstances, of course, could be relevant in some cases.

The factors outlined in *Keel* lend a measure of clarity to the rather legalistic definition of possession when joint control becomes an issue and will often provide the jurors with fair guidance in weighing the relevant evidence. See *State v. Hazley*, 28 Kan. App. 2d 664, 672, 19 P.3d 800 (2001); *State v. Judd*, No. 112,606, 2016 WL 2942294, at *6 (Kan. App. 2016) (unpublished opinion). In *Hazley*, this court held jurors should be instructed on the factors related to nonexclusive possession in factually appropriate cases, and the failure to do so there created error that materially contributed to the reversal of the defendant's conviction for possession of illegal drugs. 28 Kan. App. 2d at 672. We have consistently recognized such an instruction to be proper in joint control or nonexclusive possession cases. See, e.g., *Judd*, 2016 WL 2942294, at *6; *State v. Sierra-Medrano*, No. 94,580, 2006 WL 2265080, at *5 (Kan. App. 2006) (unpublished opinion); *State v. Gross*, No. 92,371, 2005 WL 1500874, at *4-5 (Kan. App. 2005) (unpublished opinion). In short, an instruction outlining the factors is legally appropriate.

Such an instruction appeared as part of PIK Crim. 3d 67.13-D (2009 Supp.) with directions for its use in factually appropriate cases. The authors of the pattern instructions deleted that portion of the instruction when the Legislature codified the definition of

possession in the predecessor to K.S.A. 2020 Supp. 21-5701(q). The reasons for excising that part of the instruction were unstated and aren't readily apparent. The statutory definition of possession doesn't usurp or eliminate factual circumstances keyed to defenses based on lack of joint control or nonexclusive possession any more than the indistinguishable common-law definition did. So the instruction remained both useful and appropriate after codification. In light of *Keel*, the authors of the pattern instructions restored the language setting out the factors to PIK Crim. 4th 57.040 covering possession of controlled substances. The restoration occurred around or after Brooks' trial in early 2018. The district court, therefore, probably correctly noted the absence of any pattern instruction on joint-control factors. While that may explain the district court's decision, it doesn't obviate any resulting error. See *Judd*, 2016 WL 2942294, at *6 (recognizing the failure to instruct on factors related to nonexclusive possession to be error notwithstanding absence of pattern instruction).

Brooks requested this jury instruction:

"'Possession' means having joint or exclusive control over an item with knowledge of and the intent to have such control or knowingly keeping some item in a place where the person has some measure of access and right of control. Among the many factors you are free to consider in determining if a person has possession is a person's use of controlled substances, a person's previous participation in the sale of a controlled substance, a person's proximity to the area where the drugs are found, whether the drugs are found in plain view, whether the person made incriminating statements, whether the person engaged in suspicious behavior, and the proximity of the person's possessions to the drugs. However, a person's mere presence at the scene or proximity to a controlled substance, standing alone, is not sufficient to prove possession."

The first sentence incorporates the statutory definition of possession and is a correct statement of the law. The second sentence approximates the factors bearing on joint control listed in *Keel* and the pattern instructions. The last sentence reflects another

24

correct statement of the law but has not typically been included in jury instructions. See *State v. Beaver*, 41 Kan. App. 2d 124, Syl. ¶ 6, 200 P.3d 490 (2009).[2]

[2] The relevant portion of PIK Crim. 3d 67.13-D (2009 Supp.) stated:

"When a defendant is in nonexclusive possession of (the premises upon) (an automobile in) which a controlled substance is found, it cannot be inferred that the defendant knowingly possessed the controlled substance unless there are other circumstances linking the defendant to the controlled substance. You may consider the following factors in determining whether the defendant knowingly possessed the controlled substance, if you find they are supported by the evidence:

"1. whether the defendant previously participated in the sale of a controlled substance;

"2. whether the defendant used controlled substances;

"3. whether the defendant was near the area where the controlled substance was found;

"4. whether the controlled substance was found in plain view;

"5. whether the defendant made any incriminating statements;

"6. whether the defendant's behavior was suspicious; and

"7. whether the defendant's personal belongings were near the controlled substance."

The restoration in PIK Crim. 4th 57.040 incorporated the same language.

Brooks' proposed instruction hewed closely to the template in PIK Crim. 3d 67.13-D (2009 Supp.) and easily could have been conformed to it. The instruction was not an eccentric or jumbled legal pronouncement that could have been rejected for that reason. See *State v. Wade*, 45 Kan. App. 2d 128, 139, 245 P.3d 1083 (2010).

Without belaboring the circumstances here, an instruction on joint possession or nonexclusive control was factually appropriate. Both Williams and Brooks regularly occupied the apartment and, for the most part, the cocaine and the paraphernalia appeared to be accessible to either of them. Because Brooks requested the instruction and it was legally and factually appropriate, we find the district court erred in failing to provide the jurors with some approximation of the instruction or the language from PIK Crim. 3d 67.13-D (2009 Supp.) (now in PIK Crim. 4th 57.040).

We, therefore, turn to the last sequential step to assess the effect of the error and whether Brooks was deprived of a fair trial. The error does not directly compromise Brooks' constitutional rights. The burden falls on the State, as the party benefiting from the error, to show there was no reasonable probability the verdicts would have been different had the district court properly instructed the jury, taking account of the trial record as a whole. See *State v. James*, 309 Kan. 1280, 1302, 443 P.3d 1063 (2019); *Plummer*, 295 Kan. at 162-63.

Neither Brooks nor Williams testified during the trial. And neither of them participated in a sit-down interview with law enforcement officers that was admitted as evidence. Mathew Johnson testified as a defense witness and told the jurors he purchased cocaine from Williams at the apartment several times in March 2017. Johnson described himself as a friend of Brooks and became acquainted with Williams through him. According to Johnson, Williams typically took the cocaine from a container inside a Crown Royal bag and weighed it on a scale. Johnson told the jurors Brooks did not participate in the drug transactions, although he was elsewhere in the apartment. In addition, Johnson briefly discussed his background: He grew up in Leavenworth, was about 19 years old when he bought the cocaine, and has struggled with substance abuse problems. We may infer the jurors discounted Johnson's testimony or at least the implication Brooks had nothing to do with the cocaine and the drug paraphernalia.

26

Under the circumstances, we doubt an instruction on factors bearing on joint control or nonexclusive possession would have caused the jurors to find Brooks not guilty across the board. Brooks had no documented history of illegal drug use or trafficking, and he made no incriminating statements. But the absence of such evidence is relatively weak given the evidence showing the Crown Royal bag to have been essentially out in the open in the bedroom amidst personal possessions of both Brooks and Williams. We think it would have been fairly apparent the bag did not contain a bottle of liquor. Brooks was, of course, regularly in the area where the contraband was found. And much of the cocaine was found in Brooks' prescription pill containers, although Williams could have repurposed them on her own. In short, the instruction would have been a two-edged sword for Brooks.

In closing argument, Brooks' lawyer discussed some of the factors that would have appeared in a jury instruction on joint control and suggested the circumstances tilted against finding Brooks guilty. The argument would have diminished the omission of an otherwise proper jury instruction to some extent. But a lawyer's argument does not carry the same intrinsic force as a jury instruction delivered by the district court. See PIK Crim. 4th 50.040 (jurors have "duty" to "follow all of the instructions"); PIK Crim. 4th 50.070 (jurors should disregard arguments of the lawyers not supported by evidence); *State v. Zeiner*, No. 122,682, 2021 WL 2386047, at *11 (Kan. App. 2021) (unpublished opinion) (Atcheson, J., dissenting) ("[A]rguments of lawyers do not carry anything approaching the same weight as the district court's instructions on the governing law."). The district court informed the jurors of their duty to adhere to the instructions and their right to discount the lawyers' insubstantial arguments, consistent with PIK Crim. 4th 50.040 and PIK Crim. 4th 50.070.

Brooks has not persuaded us the instructional error deprived him of a fair trial in the sense the result likely would have been different had the district court given an

27

instruction on factors to be considered in determining joint control or nonexclusive possession.

*Challenge to Aiding and Abetting Liability*

For the first time on appeal, Brooks challenges the district court's decision to give a jury instruction on aiding and abetting liability. See PIK Crim. 4th 52.140 (2020 Supp.) (responsibility for crimes of another). The district court instructed the jurors they could convict Brooks of the charged crimes if he "intentionally aid[ed] another to commit" them and had the requisite intent required for conviction. The instruction corresponds to the statutory language criminalizing aiding and abetting under K.S.A. 2020 Supp. 21-5210 and to PIK Crim. 4th 52.140. We need not consider arguments initially presented to us rather than the district court; but we may do so.

Brooks casts his argument as a broad constitutional defect in aiding and abetting liability as theory of criminal responsibility because it purportedly relieves the government of the burden of proving the elements of the underlying crime. That would be a due process violation. See *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."); *State v. Dobbs*, 297 Kan. 1225, 1238, 308 P.3d 1258 (2013) (recognizing "constitutional requirement that the State prove every element of the crime beyond a reasonable doubt"). But the premise of the argument is faulty. *State v. Bodine*, 313 Kan. 378, 397, 486 P.3d 551 (2021).

To advance an aiding and abetting theory against a defendant, the State must prove that someone—though not the defendant—committed the underlying crime. The evidence must establish each element of the crime beyond a reasonable doubt. In addition, the State also needs to prove the defendant assisted, counseled, or otherwise helped or

induced the principal to commit the crime and knew of the principal's intentions. *See State v. Simmons*, 282 Kan. 728, 738, 148 P.3d 525 (2006) (nature of aiding and abetting liability). The defendant's knowing participation in the principal's criminal activity extends liability to the defendant without relieving the State of the burden of proving the underlying crime. There is no due process violation as Brook's has framed the issue. The Kansas Supreme Court recently considered and rejected the same argument in *Bodine*, 313 Kan. at 395-97. We need not say any more.

*District Court's Treatment of Johnson as Witness*

Brooks says the district court acted improperly in front of the jury in handling Johnson as a witness. We have already set out the gist of Johnson's testimony. Recognizing that Johnson was likely headed toward incriminating himself by testifying he purchased cocaine from Williams, the district court halted Brooks' lawyer's direct examination. In the jury's presence, the district court informed Johnson he had a constitutional right not to incriminate himself and that "possession of illegal or controlled substances is a crime." The district court then asked Johnson if he was willing to answer questions about the drug transactions "without advice of counsel." Johnson answered affirmatively, and the district court permitted the questioning to resume. When Johnson finished testifying, the district court ordered him remain in the courtroom because "we'll have to wait to see if you're allowed to leave the building or not, based on your . . . admission." The district court issued its directive to Johnson in front of the jury.

Brooks characterizes the district court's statements as judicial comment error that deprived him of a fair trial. *State v. Boothby*, 310 Kan. 619, Syl. ¶ 1, 448 P.3d 416 (2019) (recognizing "judicial comment error" as a specific form of judicial misconduct). We agree the district court erred, but we do not discern material prejudice to Brooks and, therefore, find the error to be harmless.

29

In *Boothby*, the Kansas Supreme Court recast the identification and evaluation of what had been generically termed "judicial misconduct" by carving out what it now characterizes as "'judicial comment error.'" 310 Kan. 619, Syl. ¶ 1. Judicial comment errors entail inappropriate statements a district court makes in front of a jury apart from the recitation of instructions or the substance of a specific legal ruling. 310 Kan. 619, Syl. ¶ 1. The court described a two-step analytical process to address an ostensible judicial comment error: (1) Does the challenged statement fall outside what a district court may properly say, i.e., is it error at all; and (2) if so, has the complaining party's right to a fair trial been substantially prejudiced as a result? 310 Kan. at 627. In fashioning the scope of and analytical method for judicial comment error, the court drew directly from an earlier decision revamping what had been termed prosecutorial misconduct. 310 Kan. at 627 (citing *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 [2016]).

If a judicial comment error adversely affects a criminal defendant, then the State, as the benefited party, must show beyond a reasonable doubt that the error did not deprive the defendant of a fair trial, meaning the outcome, considering the entire record, would have been the same had the error not occurred. 310 Kan. at 627. The standard for evaluating prejudice realigns the burden of proof. Under the traditional judicial misconduct standard, a defendant must prove both the error and actual prejudice. But if a defendant has established a judicial comment error, the State must show the lack of prejudice. 310 Kan. at 626-27.

We do not offer a primer on how district courts should deal with unrepresented witnesses whose testimony may implicate them in criminal activity. Those witnesses almost certainly should be informed of their constitutional privilege against self-incrimination in some manner and the most immediate ramifications of waiving that protection. The district court's approach in this case seems abbreviated, although there is a countervailing risk of impermissibly dissuading a witness from testifying. See *United States v. Serrano*, 406 F.3d 1208, 1215-16 (10th Cir. 2005). More to the point, though,

we are confident that any discussion with a witness about possible self-incrimination should be conducted outside the presence of the jurors. See *State v. Lashley*, 233 Kan. 620, 626, 664 P.2d 1358 (1983) ("Claims of privilege should be determined outside the presence of the jury, since undue weight may be given by a jury to a claim of privilege."); see also *People v. Locash*, No. 346,294, 2021 WL 1157276, at *5 n.2 (Mich. Ct. App. 2021) (unpublished opinion) ("We note that this Court has held that 'if a trial court finds that it is necessary to inform a witness of his [or her] Fifth Amendment rights, the court should do so out of the presence of the jury.'") (quoting *People v. Avant*, 235 Mich. Ct. App. 499, 515, 597 N.W.2d 864 [1999]).

The Kansas appellate courts have similarly held that a person should not be called as a witness simply to assert his or her privilege against self-incrimination in front of the jury. *Lashley*, 233 Kan. at 626; *State v. Crumm*, 232 Kan. 254, 257-59, 654 P.2d 417 (1982); *State v. Simpson*, 29 Kan. App. 2d 862, 872-74, 32 P.3d 1226 (2001); *State v. Hunter*, No. 121,296, 2021 WL 520678, at *5 (Kan. App. 2021) (unpublished opinion). The two situations are not identical, but they are of a kind and tend to expose jurors to matters that would, at the very least, distract from their task in assessing the quality and credibility of the admissible testimony and other evidence.

The district court's order to Johnson at the end of his testimony created another distraction, especially since other witnesses were excused and allowed to leave when they finished testifying. We suppose the district court ostensibly had grounds to make a citizen's arrest of Johnson based on his testimony and other evidence admitted during the trial. See K.S.A. 22-2403(1). But we put aside any further consideration of the district court's legal authority to detain Johnson. Whatever the authority, the district court should have exercised it outside the presence of the jurors.

The statements the district court made to Johnson regarding self-incrimination early in his testimony and ordering him to remain at the conclusion of his testimony

singularly and collectively amounted to judicial comment error precisely because they were made in front of the jurors. But the matter of resulting prejudice isn't as plain. Although Johnson was a defense witness, the district court's comments and actions did not seem to impinge distinctly on either Brooks or the State. The remarks could not reasonably be viewed as having an adverse impact on Johnson's credibility. If anything, they may have indirectly tended to bolster the testimony. The jurors were aware that notwithstanding a warning he faced potential criminal liability, Johnson testified to buying cocaine from Williams. And they may have inferred the district court would have allowed Johnson to leave if it considered his admissions to be unworthy of belief.

Brooks suggests the district court's treatment of Johnson reflected or conveyed to the jurors a partiality toward the State and its case against him. But Brooks doesn't anchor his suggestion in a particularized argument and simply relies on his generalized supposition. We are left unpersuaded. Brooks also says the district court effectively branded Johnson a likely criminal wrongdoer because he admitted purchasing cocaine. As we have indicated, the jurors may very well have drawn that conclusion from what they saw and heard from the district court. Johnson, of course, admitted to the conduct itself in his testimony. And we doubt the criminality of that sort of conduct came as much of a surprise to the jurors. We expect most people understand possession of cocaine to be illegal, and they certainly are presumed to know as much. See *State v. Cook*, 286 Kan. 766, 775, 187 P.3d 1283 (2008) (recognizing proposition that all persons presumed to know laws of jurisdiction in which they live). Moreover, the jurors had spent two days listening to evidence in a criminal prosecution of Brooks for the cognate offense of possessing cocaine with the intent to distribute it.

Assuming for the sake of argument that the State derived some advantage from the district court's erroneous comments regarding Johnson, the corresponding prejudice to Brooks was negligible. The State's evidence against Brooks was not enhanced; nor was his evidence for not guilty verdicts diminished. We entertain no reasonable doubt the

32

result would have been different had the district court dealt with Johnson's testimony outside the presence of the jury.

*Cumulative Error*

For his final point on appeal, Brooks contends the cumulative effect of the trial errors deprived him of a fair hearing and so tainted the guilty verdicts as to require their reversal. We disagree.

Appellate courts will weigh the collective impact of trial errors and may grant relief if the overall impact of the imperfections deprived the defendant of a fair trial even when the errors considered individually would not necessarily require reversal of a conviction. *State v. Harris*, 310 Kan. 1026, 1041, 453 P.3d 1172 (2019); *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). An appellate court examines the entire trial record to assess the aggregate effect of multiple trial errors. 301 Kan. at 168. The assessment takes account of "how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence." *State v. Miller*, 308 Kan. 1119, 1176, 427 P.3d 907 (2018).

In measuring cumulative error, we consider the district court's failure to instruct on factors related to joint possession or nonexclusive control of illegal drugs and its handling of Johnson's testimony. The insufficiency of the State's evidence to prove Lawson Elementary satisfied the definition of school property does not figure into the analysis. Brooks has never disputed the admissibility of the testimony of Det. St. John and Det. Vogel, so the jurors properly heard that evidence. Without belaboring what we have already discussed, the two errors we consider did not collectively deprive Brooks of a fair trial. The omission of the jury instruction had only a limited impact on the trial. The instruction itself would have benefited Brooks in some ways and disadvantaged him in others. As we have said, we see no tangible prejudice to Brooks with respect to Johnson's

appearance as a witness. There really is nothing to aggregate, although we have identified two pertinent errors. We find no cumulative error.

We, therefore, reverse Brooks' conviction for possession of cocaine with the intent to distribute within 1,000 feet of school property and vacate the sentence. We remand with directions to the district court to find Brooks guilty of possession of cocaine with the intent to distribute and to sentence him accordingly. We otherwise affirm the district court and uphold the remaining convictions and sentences.

Affirmed in part, reversed in part, vacated in part, and remanded with directions.